# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3948
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Robert Hackman, | * | |
| | * | |
| Appellant. | * | |

_____

No. 09-3949

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | [PUBLISHED] |
| | * | |
| v. | * | |
| | * | |
| Teddy Kiriakidis, also known as | * | |
| Teddy Bogart, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 20, 2010
Filed: January 10, 2011

_____

Before WOLLMAN, LOKEN, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Robert Hackman and Teddy Kiriakidis appeal from sentences arising out of a Missouri-based dog-fighting conspiracy. Each man pleaded guilty to conspiring to engage in animal fighting ventures in violation of 18 U.S.C. § 371, and Hackman additionally pleaded guilty to engaging in animal fighting ventures in violation of 7 U.S.C. § 2156. When sentencing each defendant, the district court[1] applied an upward departure provision found in the application notes to United States Sentencing Guidelines (USSG or Guidelines) § 2E3.1. Each appellant argues that his relevant conduct was not sufficiently cruel to warrant the upward departure. We disagree with the appellants and affirm the district court.

I.

The undisputed portions of the relevant presentence investigation reports supply the following facts: In January 2008, law enforcement began investigating a conspiracy involving Hackman and Kiriakidis. Over a number of years, members of the conspiracy bred, raised, trained, sold, and fought pit bull terriers. The men tested and selected their dogs for aggressiveness and fighting ability. They did this by holding test matches, called "rolls," and thereafter breeding what they believed to be superior animals and killing or selling inferior animals. They also used the rolls to prepare the fighting pit bull terriers for later "contract fights," where money is wagered and referees enforce formal rules. Further, the men employed sophisticated

_____

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

-2-

techniques to condition the dogs to fight harder and longer, including weight training, steroids, and medicine to treat injuries. Using these techniques, the conspiracy produced sought-after fighting pit bull terriers. Hackman acknowledged his reputation as a producer of respected fighting dogs, some of which he sold for up to $2500.

One canine victim of this conspiracy, a pit bull terrier known as "Bo," provides a microcosmic example of how the conspiracy operated. Kiriakidis owned Bo and rolled him against a dog owned by Hackman. After the roll, Hackman purchased Bo from Kiriakidis. Hackman sold the dog to a third individual for $1500. Just over a month later, Hackman and Kiriakidis were present when Bo fought in a contract fight lasting over one hour. Hackman placed a $300 wager, betting on Bo to win the fight.

After such fights, some of the coconspirators "would routinely inhumanely abandon, destroy and otherwise dispose of Pit Bull Terriers that lost fighting competitions, did not perform aggressively enough, or that became injured, wounded or disabled as a result of participating in an animal fighting venture." (Hackman PSR at 4.) On one such occasion, Kiriakidis hosted a contract fight between pit bull terriers from Indiana and Oklahoma. After the two dogs fought for one hour and nineteen minutes, one of the dogs was incapacitated and the dog's owner decided to kill her. Kiriakidis supplied clips and wires, attached them to the dog, and was prepared to plug in an electrical cord to begin to electrocute the dog when the dog's owner decided that he should perform the execution. The owner plugged in the wire, and the dog seized but did not die. A third party plugged the cord into a different outlet, supplying an apparently more powerful electrical charge, and the dog finally expired.

After an eighteen-month investigation, law enforcement executed search warrants at numerous locations. Law enforcement seized thirteen pit bull terriers from Hackman's residence and twenty-four pit bull terriers from Kiriakidis's residence. Law enforcement also seized numerous items associated with dog fighting from each

-3-

man's residence.  In all, law enforcement seized nearly two hundred pit bull terriers from the conspirators.

Hackman and Kiriakidis were among five men indicted as a result of the investigation.  Hackman was indicted on four counts.  He entered into a stipulation and plea agreement wherein the Government agreed to dismiss two of the counts and Hackman agreed to plead guilty to one count of conspiring to engage in animal fighting ventures in violation of 18 U.S.C. § 371 and one count of engaging in animal fighting ventures in violation of 7 U.S.C. § 2156.  The applicable advisory sentencing guidelines range was zero to six months, but the district court applied the upward departure provision contained in USSG § 2E3.1 application note 2 and sentenced Hackman to be incarcerated for twelve months and one day.

Similarly, Kiriakidis was indicted on two counts.  Pursuant to a stipulation and plea agreement he pleaded guilty to one count of conspiring to engage in animal fighting ventures in violation of 18 U.S.C. § 371.  The advisory sentencing guidelines range for Kiriakidis was also zero to six months, but the district court departed upwards and sentenced Kiriakidis to eighteen months' imprisonment.

II.

Hackman and Kiriakidis each appealed his respective sentence.  On appeal of a criminal sentence, "'we review *de novo* the district court's interpretation and application of the Guidelines, we review for clear error the district court's factual findings, and we review for an abuse of discretion the district court's decision to depart from the appropriate Guideline range.'" United States v. Stewart, 509 F.3d 450, 453 (8th Cir. 2007) (quoting United States v. Peterson, 455 F.3d 834, 837 (8th Cir. 2006)) (marks omitted).[2]

_____

[2]The Government argues that neither appellant preserved error in the district court and also argues we should review each appellant's alleged errors only for clear

III.

A. Hackman.

Hackman argues that the district court erred in applying the upward departure for extraordinary cruelty because his legally relevant conduct, as defined by the Guidelines, does not amount to extraordinary cruelty, as that phrase is reasonably interpreted. He contends that the district court improperly considered conduct that is not legally relevant to his sentencing under the Guidelines. At the same time, he argues that the district court erroneously interpreted the phrase extraordinary cruelty, effectively allowing merely ordinary cruelty to qualify for the upward departure. Because the legally relevant offense conduct amounts to extraordinary cruelty under the Guidelines, we affirm the district court's sentence.

At the sentencing hearing, the district court found that Hackman repeatedly engaged in animal fighting ventures as part of his connection to a culture of dog fighting. The court found that Hackman raised and sold multiple dogs knowing that the dogs would be employed in animal fighting ventures, knowing that some of those dogs would die in combat, and knowing that other dogs would be severely injured and then disposed of inhumanely. At the same time, the district court explicitly recognized that Hackman was not alleged to have personally killed or maimed any of the dogs.

The district court was entitled to accept as true any facts within the PSR to which Hackman did not object specifically. See United States v. Razo-Guerra, 534 F.3d 970, 975 (8th Cir. 2008), cert. denied, Rubio-Guerrero v. United States, 129 S.

_____

error. We acknowledge that this is a close question, but we need not decide whether appellants preserved error because, even if we assume they did preserve error and we apply the more strenuous standards of review detailed above, each appellant's claim still fails.

Ct. 1365 (2009); Fed. R. Crim. P. 32(i)(3)(A). While Hackman asked the district court to exercise its discretion to refuse to depart upward for extraordinary cruelty, he did not challenge any specific fact in the PSR. Thus, the district court was entitled to rely on the facts contained in the PSR in analyzing the applicability of the enhancement.

The PSR describes Hackman's sustained involvement in a long-running conspiracy to breed, raise, train, sell, and fight pit bull terriers. Hackman bought and sold dogs from various members of the conspiracy and attended numerous dog fights. He acted as referee for some fights and held the wagered money for others. After these brutal contests, Hackman's coconspirators "would routinely inhumanely abandon, destroy and otherwise dispose of Pit Bull Terriers that lost fighting competitions, did not perform aggressively enough, or that became injured, wounded or disabled as a result of participating in an animal fighting adventure." (Hackman PSR at 4.) Further, the PSR recounted Hackman's attendance at two separate hour-long dog fights, occurring approximately three months apart. The first of those fights featured a dog Hackman had previously owned, and the second fight resulted in the maiming and execution of one of the dogs. Nothing in the record suggests that the two fights were unusual for this conspiracy. Those uncontested facts from the PSR provide sufficient support to convince us that the district court did not clearly err in finding that Hackman knew the dogs he sold could die or be maimed.

Section 2E3.1(a)(2) of the Guidelines provides a base offense level of ten for an offense involving an animal fighting venture. Additionally, application note 2 allows for an upward departure "[i]f the offense involved extraordinary cruelty to an animal that resulted in, for example, maiming or death to an animal." The Guidelines define "offense" to mean "the offense of conviction and all relevant conduct under [USSG] § 1B1.3." USSG § 1B1.1 comment. (n.1(H)). In turn, USSG § 1B1.3(a)(1)(A) defines relevant conduct to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."

Hackman does not argue that he did not aid or abet multiple animal fighting ventures described in the PSR. He does contend, however, that the aforementioned conduct does not amount to extraordinary cruelty under a reasonable interpretation of the statute. He argues that the district court erroneously interpreted the phrase extraordinary cruelty, effectively allowing merely ordinary cruelty to qualify for the upward departure.

We employ basic rules of statutory construction when interpreting the Guidelines, United States v. Parker, 267 F.3d 839, 847 (8th Cir. 2001), cert. denied, 535 U.S. 1101 (2002), and an application note is as binding on a district court as the guideline that it explains unless the note "is plainly erroneous, conflicts with the Constitution, a federal statute, or the guideline" itself, United States v. Smith, 282 F.3d 1045, 1047 (8th Cir. 2002). The Guidelines do not define extraordinary cruelty. Hackman does not argue that application note 2 is plainly erroneous or conflicts with other law. "We therefore turn to the ordinary meaning of the terms to guide our review" of such application notes. Parker, 267 F.3d at 847.

Endeavoring to ascertain the ordinary meaning of a word, this court often relies on a dictionary. See, e.g., id. (considering ordinary meaning of "violence" and "sadism"). As relevant to this case, Webster's Dictionary defines "extraordinary" as "more than ordinary," "not of the ordinary order or pattern," "going beyond what is usual, regular, common, or customary," "not following the general pattern or norm," "exceptional to a very marked extent," "most unusual," "far from common," "very outstanding," "very remarkable," "rarely equaled," "singular, phenomenal," "having little or no precedent and usu[ally] totally unexpected," "very curious, strange, or surprising," or "amazing." Webster's Third New International Dictionary, 807 (1986). Black's Law Dictionary defines extraordinary as "out of the ordinary; exceeding the usual, average, or normal measure or degree; beyond or out of the common order or rule; not usual, regular, or of a customary kind; remarkable; uncommon; rare."

-7-

Black's Law Dictionary, 699 (4th ed. 1968). While those definitions of extraordinary perhaps reflect a continuum of extraordinariness, and the rule of lenity may counsel us to apply an interpretation of extraordinary favoring Hackman if more than one reasonable definition may apply, see Rowe v. Lockhart, 736 F.2d 457, 461 (8th Cir. 1984) (noting "ambiguities in criminal statutes must be resolved in favor of lenity" which "applies to sentencing as well as substantive provisions"), the egregious facts of this case relieve us of the necessity of defining extraordinary with etymological precision. Hackman's offenses involved extraordinary cruelty under any ordinary meaning of that phrase.

At sentencing, Hackman acknowledged that dog fighting was a way of life for him and that he had been involved in it so long that he did not see it as wrong. He acknowledged being part of this particular conspiracy since before 2008. He acknowledged selling multiple pit bull terriers over the course of this conspiracy, and thirteen pit bull terriers were seized from his residence on the day of his arrest. The conspiracy involved numerous other men engaged in the same activities, for their mutual enjoyment and benefit. The record shows that the conspirators, including Hackman, selectively bred pit bull terriers for ferocity and fighting ability. They trained the dogs with harnesses, treadmills, and practice fights. They administered steroids and other drugs both before and after fights. All of this was to improve the dogs' ability to maim and kill each other. Hackman brags that he succeeded; his dogs' bloodlines were praised and his dogs were sold for up to $2500. The conspirators allowed these dogs to fight for over one hour at a time. All of that necessarily increases the harm the dogs are capable of inflicting, and conversely are subject to receiving, in turn increasing the cruelty of the endeavor. Whether we read extraordinary to mean merely "more than ordinary" or "rarely equaled," our *de novo* legal review demonstrates that the district court did not err in interpreting the statute. Nor did it abuse its discretion in deciding to depart upward from the base offense level.

Intertwined with Hackman's statutory interpretation argument, Hackman contends that to label his conduct as extraordinarily cruel would "double count" certain conduct—accounting for the conduct once to arrive at the base offense level and a second time to support the upward departure. "Double counting occurs when 'one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" United States v. Zech, 553 F.3d 663, 668 (8th Cir. 2009) (quoting United States v. Pena, 339 F.3d 715, 719 (8th Cir. 2003)). Impermissible double counting does not occur if the conduct enhancing the punishment addresses conceptually separate sentencing notions. Id. Hackman pleaded guilty to knowingly buying, selling, delivering, possessing, training, or transporting pit bulls for the purposes of having the animals participate in animal fighting ventures, 7 U.S.C. § 2156, and to conspiring to violate the same statute, 18 U.S.C. § 371. A plain reading indicates that those statutes were violated by Hackman many times over; he garnered an offense level of ten for merely *possessing* one fighting pit bull terrier, regardless of whether any cruelty was involved. As detailed above, Hackman did much more than possess fighting pit bulls. He bred, raised, trained, sold, and fought them knowing that the dogs would be allowed, if not required, to fight until severely injured or dead. Thus, the ordinary cruelty inherent in dog fighting justifies the base offense level, while the extraordinary cruelty of Hackman's crimes separately justifies the upward departure. Further, the same factor can be considered twice "'if the factor is present to an exceptional degree.'" Pena, 339 F.3d at 719 (quoting Koon v. United States, 518 U.S. 81, 96 (1996)). As the foregoing demonstrates, cruelty is present to an exceptional degree in this case.

B. Kiriakidis.

Kiriakidis makes essentially the same arguments as Hackman. The relevant conduct—breeding, raising, training, selling, and fighting pit bull terriers—is nearly identical, with one substantial addition: Kiriakidis promoted, facilitated, hosted, and

refereed a dog fight lasting one hour and nineteen minutes, wherein a pit bull terrier was severely injured. Then, he assisted in the inhumane execution of the dog by connecting electrical wires to the dog in advance of the execution. Thus, the maiming and electrocution of the dog were clearly acts "aided, abetted, counseled, . . . [and] procured" by Kiriakidis under USSG § 1B1.3(a)(1)(A). We note Kiriakidis's argument that the execution cannot be relevant conduct because the killing was sanctioned by the dog's owner, and we find it unnecessary to decide the issue. Whether the execution was legal under Missouri law, a proposition we find extremely suspect, is not dispositive because the plain language of the upward departure provision states that the maiming of a dog is enough to satisfy the extraordinary cruelty requirement. As the discussion of Hackman's crimes demonstrates, the district court did not err in interpreting USSG § 2E3.1 application note 2, nor did the district court abuse its discretion by applying the extraordinary cruelty upward departure to Kiriakidis's conduct.

IV.

Accordingly, the judgment of the district court is affirmed with respect to each appellant.

_____