SMITH, Circuit Judge.
Owner-Operator Independent Drivers Association, Inc. (“OOIDA”), Joseph Rajkovacz, and Carl Schaefer, LLC (“Schaefer”), sued Supervalu, Inc. (“Supervalu”) under 49 U.S.C. § 14103(a) for the reimbursement of fees associated with the loading and unloading of its trucks at Supervalu’s facilities. In a pair of orders granting summary judgment in Supervalu’s favor, the district court[1] construed § 14103(a) to *859 require that OOIDA prove, as part of its prima facie case, that (a) its truckers were not otherwise reimbursed by their respective shippers and (b) the amount of insurance coverage that Supervalu required OOIDA drivers to maintain was unreasonable. According to the district court, OOI-DA failed to present more than a scintilla of evidence as to either of these elements. Finally, the district court also construed § 14704(a)(1) to preclude the recovery of monetary relief as a remedy for the violations that OOIDA alleges. For the following reasons, we affirm.
I. Background
As this is an appeal from the grant of summary judgment, we review and recite the facts in the light most favorable to OOIDA as the non-moving party. Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir.1991). OOIDA, incorporated in Missouri and maintaining its principal place of business there, is a nonprofit trade association of truck drivers who own and operate heavy-duty trucks. Rajkovacz, also a Missouri citizen and a current member of OOIDA, was an independent truck owner-operator who delivered goods on a per-load basis. Likewise, Schaefer, a Delaware corporation maintaining its principal place of business in Ohio, is an independent owner-operator that delivers on a per-load basis. For simplicity, we will refer to OOIDA, Rajkovacz, and Schaefer collectively as, “OOIDA.” Supervalu, a Delaware corporation headquartered in Minnesota, is a grocery wholesaler that received goods shipped by OOIDA.
This ease involves a practice known in interstate-trucking parlance as “lumping.” “Lumping” refers to the loading, and, more often, unloading of goods from a truck upon delivery. Naturally, the individuals who perform these loading and unloading services are commonly referred to as “lumpers.” Prior to 2005, opportunistic lumpers unaffiliated with Supervalu habitually congregated at the loading docks of Supervalu’s distribution centers to solicit their services to OOIDA and other arriving truckers. But, in 2005, Supervalu contracted with professional unloading companies for their exclusive lumping services, resulting in only Supervalu’s lumpers being present at its distribution centers. In March 2005, Supervalu instituted a new insurance coverage requirement applicable only to drivers like OOIDA, who opted to load or unload their own vehicles rather than hire Supervalu’s new lumpers. As a precondition for self-loading/unloading, OOIDA and other truckers had to show proof of general-liability insurance significantly exceeding the minimum required by federal law.[2] In August 2005, Supervalu reduced the amount of insurance it required of self-loaders/unloaders,[3] and after OOIDA commenced the instant lawsuit on December 5, 2005, Supervalu finally relaxed its policy to require proof of insurance coverage merely matching federal law.
Nevertheless, on December 5, 2005, OOIDA, representing its members as well as other similarly situated truckers, filed *860 this putative class action against Supervalu, alleging, inter alia,[4] that Supervalu’s insurance-coverage requirement effectively required OOIDA drivers to purchase Supervalu’s new lumping services, in violation of § 14103(a). Section 14103(a) requires that a truck owner or operator be compensated when a shipper or receiver requires him or her to utilize lumpers. OOIDA contended that Supervalu, by ostensibly requiring self-loading/unloading truckers to tender proof of insurance exceeding statutory mínimums, effectively compelled OOIDA truckers to purchase Supervalu lumping services at their own cost, with no subsequent reimbursement. For these alleged violations, OOIDA sought “restitution,” as well as an “accounting and disgorgement of money paid by drivers for lumping services between March 28 and December 20 of 2005.”
In response, Supervalu countered with three primary arguments. First, Supervalu contended that it never expressly required OOIDA under § 14103(a) to utilize its lumping service, and that self-loading/unloading truckers retained their prerogative to self-load/unload so long as they maintained adequate insurance. According to Supervalu, its insurance requirement could be construed as a requirement to hire lumpers only if Supervalu mandated an unreasonable amount of coverage. Alternatively, Supervalu urged that, even assuming arguendo that it required OOI-DA to employ Supervalu lumpers, OOIDA produced no evidence of a violation under § 14103(a) because all plaintiff truck drivers were subsequently reimbursed their lumping fees by their respective shippers. As the basis for this contention, Supervalu relied on § 14103(a)’s plain language, which provides that:
[wjhenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce ... be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.
(Emphasis added.)
Finally, Supervalu contended that, notwithstanding the merits of OOIDA’s case, 49 U.S.C. § 14704(a)(l)’s remedial scheme authorizes only “injunctive relief’ for violations of § 14103, not “restitution” or an “accounting and disgorgement of money paid” as sought by OOIDA. See 49 U.S.C. § 14704(a)(1) (“A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.”).
The district court set out its view of the law governing the case in two orders resolving two separate rounds of cross-motions for summary judgment. In the first order, dated November 29, 2006, the district court denied summary judgment to both parties on OOIDA’s claim under § 14103(a). Specifically, the district court “agree[d] [with Supervalu] that the reasonableness of the insurance coverage requirement is key to the determination of whether Supervalu violated § 14103(a)[,]” and that “Supervalu cannot be considered to have required the use of lumpers solely by its imposition of a requirement for insurance above the statutory minimum if the insurance coverage requirement is reasonable.” Construing the requirement’s reasonableness to be a disputed issue of material fact, and noting that merits dis *861 covery was in its infancy, the district court denied both parties’ motions for summary judgment.
Additionally, the court denied OOIDA’s motion to strike Supervalu’s eleventh affirmative defense, which asserted non-liability on the ground that OOIDA “ ‘ha[d] already been paid by shippers or others for any himping[-]service costs incurred at Supervalu facilities during the applicable time period.’ ” The district court agreed with Supervalu’s reading of § 14103(a)’s plain language. The district court concluded that its interpretation of the statute might be burdensome to drivers like OOI-DA “but is not absurd.” The district court ruled in its order that, “[t]o prove that Supervalu violated § 14103(a), [OOIDA] must show that neither a receiver nor a shipper paid a driver for lumping service costs incurred at Supervalu.” The district court accompanied this rule with the following footnote:
Under the court’s interpretation, plaintiffs must prove as an element of the offense that neither the shipper nor receiver paid for the lumping costs. It is therefore improper to characterize this as an affirmative defense, but there is nevertheless no reason to strike it.
Finally, the district court granted summary judgment to Supervalu as to its second counterclaim, which sought declaratory judgment that § 14103(a) did not afford OOIDA a right to monetary relief. Again, relying on the statute’s plain language, the district court found “no statute explicitly authorizing] restitution as a remedy for an alleged violation of § 14103 against a receiver of property,” and consequently “determine[d] that if ‘Congress wished to provide a private damages remedy, it knew how to do so and [would have done] so expressly.’ ” Moreover, the trial court rejected OOIDA’s contention that Congress, in employing the phrase “injunctive relief,” necessarily evoked the broad equity jurisdiction of district courts.
On March 24, 2009, the district court resolved the parties’ second round of cross-motions for summary judgment. Relevant to this appeal, the district court disposed of OOIDA’s claims under § 14103(a). The district court granted summary judgment to Supervalu as to (1) its counterclaim for declaratory judgment that it did not violate § 14103(a) and, correspondingly, (2) OOIDA’s affirmative claim for injunctive relief under § 14103(a). As the basis for its ruling, the district court found that “plaintiffs have not presented more than a ‘scintilla’ of evidence that drivers were not reimbursed for lumping services at Supervalu docks.” Having found OOIDA’s evidence to be wholly insufficient on this element, the district court made no mention of whether Supervalu’s insurance requirement was reasonable.
OOIDA and Supervalu settled all remaining claims, subject to OOIDA retaining its right to appeal some of the district court’s pretrial orders. OOIDA timely appealed and now alleges that the district court erred in three respects when construing §§ 14103(a) and 14704(a)(1): (1) in reading § 14103(a) to require OOIDA to prove as part of its prima facie case that it was not reimbursed by a shipper; (2) in ruling that Supervalu’s insurance requirement could be construed as effectively mandating OOIDA to purchase lumping only if the requirement called for “unreasonable” amounts of coverage; and (3) in reading § 14704(a)(l)’s provision for “injunctive relief’ to authorize only injunctions, and not other equitable forms of monetary relief such as “restitution” or “accountings and disgorgement.”
II. Discussion
OOIDA urges this court to read 49 U.S.C. § 14103(a) as “imposing] an un *862 qualified duty on receivers like Supervalu to provide delivery persons with compensation where those receivers require the delivery persons to obtain unloading services.” Specifically, OOIDA maintains that “third[-]party reimbursement” like the kind its drivers received from their respective shippers “is irrelevant to a receiver’s duty to compensate under Section 14103(a).” OOIDA cites no case law or legislative history to support this interpretation but states simply that it is “[t]he simplest and least burdensome interpretation of the statute.” Additionally, OOIDA offers the public policy argument that the district court’s contrary construction “turns Section 14103(a) into a statute that only provides relief to delivery persons through litigation and deprives them of the day-to-day benefits that the statute contemplates.” “We review de novo the district court’s grant of summary judgment, as well as the district court’s interpretation of ... a federal statute.” Jessep v. Jacobson Transp. Co., Inc., 350 F.3d 739, 741-12 (8th Cir.2003).
1. Section 11103(a)’s Plain Language
Whether, under § 14103(a), the shipper or receiver reimbursing a trucker’s lumping fees must be the same shipper or receiver who originally required the lumping is a question of first impression. Still, as with any question of statutory interpretation, the court begins its analysis with the plain language of the statute, United States v. I.L., 614 F.3d 817, 820 (8th Cir.2010). As we recently noted, “[t]he Supreme Court has ‘stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.’ ” Id. (quoting in part Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). “When the words of a statute are unambiguous, then, this first canon is also the last: ‘judicial inquiry is complete.’ ” Id. (quoting in part Germain, 503 U.S. at 254, 112 S.Ct. 1146).
Here, § 14103(a) provides in pertinent part that, “[w]henever a shipper or receiver of property requires that any person who owns or operates a motor vehicle ... be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator” for the costs thereof. 49 U.S.C. § 14103(a) (emphasis added). The district court concluded that this plain language— particularly the disjunctive “or” situated between “shipper” and “receiver” — when read literally, confirms that the shipper or receiver reimbursing a trucker’s lumping fees need not be the same shipper or receiver who required the trucker to incur them. Thus, under the district court’s reading, § 14103(a)’s plain language allows for either the shipper or the receiver to reimburse the trucker, irrespective of who required the trucker to purchase lumping services. Based on this reading of § 14103(a), the district court ruled as a matter of law that a plaintiff trucker suing under the provision had to show as part of his or her prima facie case that she had not been reimbursed by either the shipper or the receiver. In turn, applying this rule of law to OOIDA’s case, the district court granted summary judgment against OOI-DA because it failed to identify any of its truckers whom a shipper had not already reimbursed.
The district court erred in concluding that § 14103(a)’s plain language is unambiguous. A particular statutory provision is ambiguous when, inter alia, it is susceptible to more than one reasonable interpretation. See Chickasaw Nation v. United States, 534 U.S. 84, 90, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (defining “am *863 biguity,” in the statutory-construction context, as “capable of being understood in two or more possible senses or ways” (quoting Webster’s Ninth New Collegiate Dictionary 77 (1985))). Here, § 14103(a) is susceptible to two reasonable interpretations. The district court’s reading endeavors to give full effect to the disjunctive “or” and thereby renders the provision satisfied when either the shipper or the receiver reimburses the trucker for lumping. This construction of § 14103(a) is reasonable. Likewise, however, a reading of § 14103(a) that gives full effect to the definite article “the,” in the phrase, “the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator,” yields a similarly reasonable construction that the shipper or receiver who required the lumping must either provide the lumping or pay for it. “In determining whether statutory language is plain and unambiguous, the court must read all parts of the statute together and give full effect to each part.” Estate of Farnam v. Comm’n of Internal Revenue, 583 F.3d 581, 584 (8th Cir.2009). Accordingly, when the court gives full effect to both the disjunctive conjunction, “or,” in the phrase “shipper or receiver,” and the definite article, “the,” preceding that same phrase,” two alternatively reasonable interpretations result. Thus, § 14103(a)’s language is ambiguous. Given this ambiguity, we “may examine legislative history and other authorities to determine [Congress’s] legislative intent” behind the provision. Estate of Farnam, 583 F.3d at 584.
2. Section 11103(a)’s Legislative History
We again stress that, “[i]n the usual case, if ‘the statute’s language is plain, the sole function of the courts is to enforce it according to its terms,’ without reference to its legislative history.” Oumer-Operator Indep. Drivers Ass’n v. United Van Lines, LLC, 556 F.3d 690, 693 (8th Cir.2009) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) and construing § 14704(a)(2)). This court, when interpreting this very statute, has explained that “[t]his rule ‘results from deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.’ ” Id. (quoting Lamie v. U.S. Tr., 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)). Thus, “[w]here the plain meaning of a statute is clear, ‘we are not free to replace it with an unenacted legislative intent.’ ” Id. (quoting in part INS v. Cardoza Fonseca, 480 U.S. 421, 453, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring)). However, if the statute’s language is not plain but instead ambiguous, we may resort to legislative history and any other authorities that might facilitate our efforts to discern Congress’s intent behind the particular statutory provision in question. Estate of Famam, 583 F.3d at 584. Moreover, in those “ ‘rare cases’ when a statute’s plain text produces a result ‘demonstrably at odds with the intentions of its drafters, ... those intentions must be controlling.’ ” United Van Lines, LLC, 556 F.3d at 694 (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).
Section 14103(a) is part of the revised version of the Motor Carrier Act, to which we hereinafter refer to as, “MCA-II,” though it is properly called the Interstate Commerce Commission (ICC) Termination Act. MCA-II evolved from the first Motor Carrier Act of 1980 [hereinafter MCA-I]. Act of July 1, 1980, ch. Ill, § 15, 94 Stat. 793, 808, repealed by ICC Termination Act of 1995 [hereinafter ICC Termination Act], Title I, § 103, 109 Stat. 803, 891. Indeed, MCA-II’s lumping section — the provision at issue in this case — is a virtually verba *864 tim iteration of MCA-I’s.[5] In 1980, MCA-I was spawned out of Senate Bill 2245 (“S. 2245”) and House Bill 6418 (“H.R. 6418”), with Congress technically passing S. 2245 in lieu of H.R. 6418, but pursuant to an agreement between both chambers amending the Senate bill to contain the text of the House bill. H.R.Rep. No. 96-1069, at 1 (1980), reprinted in 1980 U.S.C.C.A.N. 2283, 2283. As stated in the Report authored by the House Committee on Public Works and Transportation — the authoritative report given that the Senate amended its own bill to contain the House language — “the purpose of the Motor Carrier Act of 1980 [wa]s to reduce unnecessary regulation by the Federal Government.” Id. at 10, reprinted in 1980 U.S.C.C.A.N. at 2292. Commensurate with this general theme of deregulation, the Committee stated with specific regard to Section 15 — the section concerning lumping — the following:
Under the circumstances, it may be difficult for the trucker to prove that the shipper, broker, or receiver agreed to repay the trucker for any expenses incurred in the loading or unloading of his truck....
• In order to promote a system which will preclude the use of force or coercion at loading docks, new section 11109(a) of title 49 establishes guidelines for who should load and unload the trucks. The purpose of this provision is not to suggest or endorse any particular apportionment of loading or unloading responsibilities between and among shippers, receivers, carriers, and owner-operators. In fact, it is the Committee’s belief that this apportionment of responsibility is a market decision to be determined by the parties to the transaction ....
[W]here an owner-operator is leased to a regulated carrier, the Committee expects the lease to specify the responsibilities of the carrier and owner-operator regarding loading and unloading, including compensation.
Id. at 30-31, reprinted in 1980 U.S.C.C.A.N. at 2312-13 (emphasis added).
OOIDA “suppose[s]” in its brief “that shippers, receivers!,] and freight brokers may agree among themselves who must bear the burden of those [unloading] costs,” but, indeed, its supposition appears to have been Congress’s precise intention when it promulgated MCA-I. This conclusion is further bolstered by the floor statements of Representative James J. Howard, then-chairman of the Committee’s Surface Transportation Subcommittee. In those statements, which he made immediately preceding the third and final reading of MCA-I, just before its passage by the *865 House, Representative Howard advised the general body that the Committee had amended the lumping sections once more to prevent broader-than-intended interpretations:
Following the Committee markup, many suggested that the “words” in section 15 [ (the lumping section) ] could be construed in a much broader manner than intended by the Committee. These amendments to sections 15 and 16 are intended to eliminate any question as to the Committee’s intent.
Let me say that the Committee’s original intent was (1) to eliminate extortionate practices that occur on the docks, (2) to ensure that clear notice is given to owner-operators when they are responsible for loading and unloading their trucks, (3) to identify any compensation that the owner-operator is to receive for such loading or unloading, and (4) to ensure that any compensation provided for is received by the owner-operator. These amendments convey this intent in a more clear manner than does the bill as reported.
126 Cong. Rec. 15643 (1980) (statement by Rep. Howard). Representative Howard’s statements emphasize that Congress’s focus in enacting MCA-I’s lumping provisions was on ex ante notice of reimbursement responsibilities, not on assigning those responsibilities to any particular party to the trucking transaction.
Fifteen years later, in 1995, Congress enacted the ICC Termination Act, dissolving the ICC, along with much of its regulatory framework, and transferring any surviving regulatory obligations to the newly formed Department of Transportation (DOT). ICC Termination Act of 1995, Pub.L. No. 104-88, 109 Stat. 803 [codified at 49 U.S.C. § 13101 et seq.l The ICC Termination Act included provisions for the newly revised MCA-II. Much like the legislative process producing its predecessor, MCA-II arose out of two bills, House Bill 2539 (“H.R. 2539”) and Senate Bill 1396 (“S. 1396”), with H.R. 2539 being passed in lieu of its Senate counterpart, pursuant to an agreement between both houses. H.R.Rep. No. 104-422, at 165 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 850 (Conf. Rep.). Most of the legislative history is contained in a House report authored by the House Transportation and Infrastructure Committee (the House Committee on Transportation and Public Works’s successor). See H.R.Rep. No. 104-311 (1995), reprinted in 1995 U.S.C.C.A.N. 793. Summarizing H.R. 2539’s motor carrier provisions, the Committee wrote that “H.R. 2539 eliminates and then reenacts a revised Motor Carrier Act ... eliminating] numerous unnecessary provisions and streamlining] many other of the ICC’s functions regarding the regulation of the motor carrier industry.” Id. at 84, reprinted in 1995 U.S.C.C.A.N. at 796. The Committee went on to declare that “H.R. 2539 is another important step in a 15-year effort to deregulation [sic] the motor carrier industry.” Id. at 91, reprinted in 1995 U.S.C.C.A.N. at 803; accord 141 Cong. Rec. 38235 (1995) (statement by Sen. Hollings) (“With this bipartisan bill, the Congress will have completed the work begun with the Motor Carrier Act of 1980, to free the surface transportation industry from unnecessary and outmoded regulation.”).
Concerning current § 14103 and lumping, the Committee stated, that “[t]his section preserves current law regarding ‘lumping’ (the utilization of other persons to load or unload freight from a truck) in the trucking industry,” and “directed] that upon transfer, DOT should not continue any dispute resolution functions regarding these rules, but rather only oversee the regulations.” H.R. Rep. No. 104-311, at *866 117 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 829 (emphasis added). Moreover, when the Senate-House Conference Committee convened to reconcile H.R. 2539 and S. 1396, that Committee noted that both bills’s lumping versions were “identical,” and the Conference simply adopted the House version. H.R.Rep. No. 104-422, at 215 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 900 (Conf. Rep.). The only “current law” which these committees could have envisioned themselves preserving was the lumping provisions of MCA I, and indeed, as already noted, MCA II’s lumping provisions found in § 14103(a) are virtually identical. See supra n. 5. Finally, that Congress envisioned lumping, as well as compensation therefor, to be decided by private contract is also reflected in other MCA-II provisions and the enabling regulations that Congress authorized DOT to promulgate. Indeed, we have noted that “[r]elated statutes” governing trucking equipment lease agreements “clarify that carriers and drivers are expected to enter into contractual agreements as to who will be responsible for unloading freight.” Jessep, 350 F.3d at 742 (citing, inter alia, 49 U.S.C. § 14102(b)); see 49 U.S.C. § 14102(b) (“any arrangement, between a motor carrier ... and any other person, under which such other person is to provide any portion of such transportation by a motor vehicle not owned by the carrier shall specify, in writing, who is responsible for loading and unloading the property onto and from the motor vehicle”). Similarly, DOT regulations enabling these related statutes mandate that “[t]he lease shall clearly specify who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service.” 49 C.F.R. § 376.12(e).
In sum, MCA-I’s more extensive legislative history reveals Congress’s legislative purpose behind MCA-II and § 14103(a): to curtail coercive and extortionate lumping practices by inducing shippers, receivers, and truckers to freely negotiate lumping among themselves in predelivery contracts. See Jessep, 350 F.3d at 742 (observing that MCA-I’s “legislative history indicates section 14103 was meant to prohibit coercive and extortionate practices”). Congress did not intend § 14103(a) to impose on any particular party an unqualified duty to reimburse incurred lumping fees. And, as we have recognized, “[t]he goal of statutory analysis, of course, is to give effect to the Congressional intent behind the statute’s enactment.” Estate of Famam, 583 F.3d at 584 (citing Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).
Returning to the facts of OOI-DA’s case, the district court, despite proceeding from the faulty first premise that § 14103(a)’s language is plain and unambiguous, ultimately arrived at the correct legal conclusion that a plaintiff trucker suing under the provision must show as part of his prima facie case that he has not been reimbursed by either the shipper or the receiver. In turn, applying this construction of § 14103(a) to OOIDA’s case, the district court properly granted summary judgment against OOIDA because OOIDA failed to identify any of its truckers whom a shipper had not already reimbursed. Likewise, this court, finding the record to be devoid of any evidence that an OOIDA trucker was not reimbursed his or her lumping fees by a shipper, concludes that the district court properly disposed of OOIDA’s suit under Rule 56. Finally, and in light of this conclusion, we need not address the remaining issues of (1) whether Supervalu’s insurance requirement constituted a de facto requirement that OOI-DA truckers purchase lumping; or (2) *867 whether 49 U.S.C. § 14704(a)(l)’s provision for “injunctive relief’ authorizes only injunctions for violations of § 14103(a), and not additional equitable remedies including “restitution” or “accountings and disgorgement.”
III. Conclusion
Having concluded that the district court properly read 49 U.S.C. § 14103(a) to preclude relief for un-reimbursed lumping absent a plaintiff-trucker’s affirmative showing that he or she was not reimbursed by either the shipper or the receiver, we affirm.

. The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

. Supervalu required self-loading/unloading drivers to show proof of general liability insurance of $3 million annual aggregate and $1 million per occurrence limit, automobile liability insurance in the amount of $ 1 million combined single limit coverage, and fidelity bond or crime insurance of $50,000 (Supervalu rescinded this final requirement shortly after its issuance). Section 31139(b)(2) of 49 United States Code requires proof of only $750,000 worth of insurance.

. In August 2005, Supervalu announced that it would require proof of only $1 million aggregate and $1 million per occurrence.

. Additionally, OOIDA sought relief under § 14103(b), which makes unlawful any attempt to coerce a trucker into utilizing lumpers. Ultimately, the parties settled this coercion claim, thus, it is not part of OOIDA’s appeal.

. Compare Motor Carrier Act of 1980 (MCA-I), ch. Ill, § 15, 94 Stat. 793, 808, repealed by ICC Termination Act of 1995, Title I, § 103, 109 Stat. 803, 891.
(a) Whenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce (whether or not such transportation is subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title) be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.
with 49 U.S.C. § 14103(a)
(a) Whenever a shipper or receiver of property requires that any person who owns or operates a motor vehicle transporting property in interstate commerce (whether or not such transportation is subject to jurisdiction under subchapter I of chapter 135) be assisted in the loading or unloading of such vehicle, the shipper or receiver shall be responsible for providing such assistance or shall compensate the owner or operator for all costs associated with securing and compensating the person or persons providing such assistance.