# United States Court of Appeals
## For the Eighth Circuit
_____

No. 21-2412
_____

United States of America

*Plaintiff - Appellee*

v.

Brett James Stimac

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 18, 2022
Filed: July 25, 2022
_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Appellant Brett James Stimac, who is not an enrolled member of the Red Lake Band of Chippewa Indians, pled guilty to one count of wildlife trafficking, in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(1) and 3373(d)(2) (Count 1), and one count of trespass on Indian land, in violation of 18 U.S.C. § 1165 (Count 2), for entering the Red Lake Indian Reservation (the Reservation), removing the head of a bear that he had killed two days before, and transporting the bear's head off the

Reservation. As relevant to this appeal, at sentencing, the district court[1] applied a two-level increase to Stimac's offense level pursuant to United States Sentencing Guidelines § 2Q2.1(b)(1)(B) based upon its findings that Stimac had a history of fish and wildlife violations and that the offense conduct involved violations of a number of laws over several days. The district court sentenced Stimac to 15 months imprisonment and 1 year supervised release. Stimac appeals his sentence, and having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On September 1, 2019, Stimac purchased a no-quota license issued by the Minnesota Department of Natural Resources (DNR), which allowed him to hunt a bear in a specified area that did not include the Reservation and was not valid until September 2, 2019. Notwithstanding these restrictions, Stimac drove to the Reservation on September 1st with the specific intent to hunt a bear and shot an American black bear estimated to weigh between 300 and 700 pounds using a compound bow. At some point on September 1st, he sent a text message reading, "Time to go kill a bear." Stimac responded to another text message on September 2nd, stating: "Sorry just seeing this. I was bear hunting and didn't get home until 11:30 last night." When asked where he was, he replied: "Up at red," presumably meaning the Reservation. He also sent a message that day stating: "I shot one last night but lost it but there are a ton up there and I'm gonna shoot another one." On September 2nd, Stimac drove Meghan Carlson, an acquaintance that Stimac met online, to three garbage dumps on the Reservation with the intent to shoot another bear. Stimac did not shoot another bear that day, but he located the carcass of the bear that he shot on September 1st. Stimac took photographs with the carcass and subsequently uploaded those photographs to Facebook with the caption: "Got it done last night with an absolute giant over 700 pounds." Stimac returned to the Reservation again on September 3rd, sawed off the bear's head with a yellow

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

hacksaw, removed the head from the Reservation, and took the head to a taxidermy shop.

On September 12, 2019, Stimac appeared on a hunting podcast and claimed that he killed the bear on September 2nd, contradicting his September 2nd Facebook post, which stated that he had killed the bear the night before. By this time, the September 2nd Facebook post had caught the attention of DNR Officer James B. Guida, and on September 15th, DNR officers executed a search warrant at Stimac's home and seized his cell phone, 71 one-pound packages of ground meat that Stimac told officers was bear meat but testing later confirmed to be deer meat, and a compound bow. Stimac voluntarily spoke with DNR officers on September 15th and told Officer Guida that he killed the bear on September 2nd in Polk County, which is an area where his no-quota license would have permitted him to hunt a bear. On September 16th, Officer Guida spoke with Stimac again, and Stimac stated that he actually killed the bear on September 1st. On September 21st, Carlson pointed law enforcement to the area where she had observed the bear's carcass on September 2nd, and Officer Guida asked Officer Paul Smith, a game warden with the Reservation, to locate the carcass. Officer Smith located the carcass near a garbage dump, which is a well-known feeding ground for bears on the Reservation. The bear's head was missing, and a yellow hacksaw was found near the bear's carcass that testing later revealed was covered in "bear material." On September 25th, Officer Guida interviewed Stimac for a third time, and Stimac appeared remorseful and stated that he should not have shot the bear.

On December 6, 2019, the government filed a two-count misdemeanor information charging Stimac with wildlife trafficking and trespass on Indian land. Stimac pled guilty to both counts, admitting at his change of plea hearing that he entered the Reservation on September 1, 2019, without permission from the Red Lake Tribal Counsel to hunt and remove wildlife and that, on or about September 3, 2019, he removed the head of a black bear from its carcass and transported the bear's head off the Reservation, but denying that he shot the bear. At sentencing, Stimac maintained that he did not kill the bear, but after hearing the testimony of four

government witnesses and reviewing the government's exhibits, the district court found that the government had proven by a preponderance of the evidence that, between September 1 and 3, 2019, Stimac entered the Reservation with the specific intent to hunt a bear; shot a bear with a compound bow, killing the animal; sawed off the bear's head; and removed the bear's head from the Reservation. The district court further found that it appeared that Stimac violated "at least four state laws . . . in connection with the commission of this offense."

The district court then addressed whether USSG § 2Q2.1(b)(1)(B), which provides that a defendant's base offense level should be increased by two levels where "the offense . . . involved a pattern of similar violations," applied in this case. Though it stated that the language of this provision "focuses on the current offense," the district court found that the enhancement applied regardless of whether § 2Q2.1(b)(1)(B) refers to applicable prior violations or violations committed in connection with the offense of conviction because Stimac had a history of fish and wildlife violations and it was uncontested that, over a period of several days, Stimac violated a number of laws when he trespassed onto the Reservation for the purpose of illegal hunting, killed a bear, sawed off the bear's head, and removed the head from the Reservation. Applying this enhancement as well as a 2-level downward adjustment for acceptance of responsibility, the district court found that Stimac had a total offense level of 6 and a criminal history category of V, which put his Guidelines range at 9 to 15 months imprisonment. The district court sentenced Stimac at the top of the Guidelines range, sentencing him to 12 months imprisonment on Count 1 and 3 months imprisonment on Count 2, to run consecutively, and 1 year supervised release on each count, to run concurrently. Stimac appeals the district court's application of § 2Q2.1(b)(1)(B) and requests that this Court remand for resentencing.

## II.

Stimac argues that there was no "pattern of similar violations" in his case supporting application of § 2Q2.1(b)(1)(B), regardless of whether the provision

refs to applicable prior violations or violations committed as part of the offense. "When considering whether there is procedural error, we review the district court's factual findings for clear error and its application or interpretation of the Guidelines de novo." United States v. Halter, 988 F.3d 1042, 1047 (8th Cir. 2021) (emphasis omitted). "[Stimac's] argument requires us to interpret the [G]uidelines, and '[w]e employ basic rules of statutory construction when interpreting the Guidelines.'" United States v. Collins, 754 F.3d 626, 630 (8th Cir. 2014) (third alteration in original) (citation omitted). We begin our analysis with the plain language of § 2Q2.1(b)(1)(B). Cf. United States v. Behrens, 644 F.3d 754, 755 (8th Cir. 2011) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute." (citation omitted)). Where the plain language of the Guidelines is unambiguous, our inquiry is complete. See United States v. Clayborn, 951 F.3d 937, 939 (8th Cir. 2020) ("Our inquiry 'will most often begin and end with the text and structure of the Guidelines.'" (citation omitted)). When determining whether a particular Guidelines provision is plain and unambiguous, this Court must read all parts of that provision together, giving full effect to each part. Cf. Owner-Operator Indep. Driver's Ass'n v. Supervalu, Inc., 651 F.3d 857, 863 (8th Cir. 2011) ("In determining whether statutory language is plain and unambiguous, the [C]ourt must read all parts of the statute together and give full effect to each part." (citation omitted)). If a provision is ambiguous, meaning that "it is susceptible to more than one reasonable interpretation," then "we 'may examine legislative history and other authorities to determine [Congress's] legislative intent' behind the provision." Cf. id. at 862-63 (alteration in original) (citation omitted) (stating same in context of statutory interpretation).

Section 2Q2.1(b)(1)(B) provides that "[i]f the offense . . . involved a pattern of similar violations, increase by 2 levels." The background provided in the commentary to § 2Q2.1(b)(1)(B) states that

> [t]his section applies to violations of the Endangered Species Act, the Bald Eagle Protection Act, the Migratory Bird Treaty, the Marine Mammal Protection Act, the Wild Free-Roaming Horses and Burros Act, the Fur Seal Act, *the Lacey Act*, and to violations of 18 U.S.C.

§§ 545 and 554 if the smuggling activity involved fish, wildlife, or plants.

USSG § 2Q2.1(b)(1)(B), comment. (backg'd.) (emphasis added). The application instructions included in the Guidelines provide that "'[o]ffense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." USSG § 1B1.1, comment. (n.1(I)). Section 1B1.3(a)(1)(A) provides that "specific offense characteristics . . . shall be determined on the basis of," *inter alia*, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." Section 2Q2.1(b)(1)(B) does not specify another meaning for the term "offense." Thus, we conclude that, here, "offense" encompasses Stimac's Lacey Act violation and all acts committed by Stimac in furtherance of that violation. See United States v. Hackman, 630 F.3d 1078, 1083 (8th Cir. 2011). The term "similar" is not defined in the application notes of § 2Q2.1(b)(1)(B) or elsewhere in the Guidelines; thus, we turn to its dictionary definition. See Thompson Truck & Trailer, Inc. v. United States, 901 F.3d 951, 953 (8th Cir. 2018) ("'[W]hen a word is not defined by statute,' as is the case here, 'we normally construe it in accord with its ordinary or natural meaning.' 'Ordinarily, a word's usage accords with its dictionary definition.'" (citations omitted)). As relevant here, "similar" means "having characteristics in common" and "alike in substance or essentials." Similar, Merriam-Webster's Collegiate Dictionary (11th ed. 2020). Thus, here, the offense must involve a pattern of violations that have characteristics in common with or are alike in substance or essentials to Stimac's Lacey Act violation.

Like "similar," the term "involved" is not defined in the application notes of § 2Q2.1(b)(1)(B) or elsewhere in the Guidelines; thus, we turn to its dictionary definition. See Thompson Truck & Trailer, Inc., 901 F.3d at 953. As relevant here, "involve" is defined as "to relate closely" and "to have within or as part of itself." Involve, Merriam-Webster's Collegiate Dictionary (11th ed. 2020). Both definitions support the interpretation that § 2Q2.1(b)(1)(B) refers to a pattern of similar

violations committed as part of the offense, but the former definition also supports the interpretation that § 2Q2.1(b)(1)(B) refers to a pattern of similar prior violations. Further, though the application notes to § 2Q2.1(b)(1)(B) do not define "pattern of similar violations," comparable language is defined in other provisions of the Guidelines in ways that support both interpretations. Compare USSG § 2B1.5, comment. (n.6(A)) ("For purposes of subsection (b)(5), 'pattern of misconduct involving cultural heritage resources or paleontological resources' means two or more separate instances of offense conduct involving a resource that did not occur during the course of the offense (i.e., that did not occur during the course of the instant offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct))."), with USSG § 4B1.3, comment. (n.1) ("'Pattern of criminal conduct' means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses."), and USSG § 2G2.2, comment. (n.1) ("'Pattern of activity involving the sexual abuse or exploitation of a minor' means any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct."). Thus, viewing all parts of § 2Q2.1(b)(1)(B) together and giving effect to each of its parts, see Owner-Operator, 651 F.3d at 863, we conclude that the language of § 2Q2.1(b)(1)(B) is ambiguous. However, our statutory interpretation analysis need not proceed further because we conclude that, under either aforementioned interpretation, the district court did not err in applying the enhancement under § 2Q2.1(b)(1)(B) in this case.

First, assuming *arguendo* that § 2Q2.1(b)(1)(B) refers to applicable prior violations, when considering both the offense and relevant conduct, Stimac has committed a pattern of prior violations similar to the instant Lacey Act violation. The Lacey Act makes it "unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase any . . . wildlife . . . taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law." 16 U.S.C. § 3372(a)(1). Stimac violated the

Lacey Act when he possessed the bear's head and transported it off the Reservation in violation of the Red Lake Tribal Code. In so violating the Lacey Act, among other acts committed by Stimac, see USSG § 1B1.3(a)(1)(A), Stimac violated Minnesota state law by taking a bear without a valid bear license, see Minn. Stat. § 97B.401(a). Stimac's presentence investigation report reveals past state fish and wildlife violations, including convictions for illegal transport of big game and failing to display a fish shelter license. Thus, we conclude that Stimac's repeated disregard for Minnesota fish and wildlife laws demonstrates a "pattern of similar violations" sufficient to warrant application of § 2Q2.1(b)(1)(B).

On the other hand, assuming that § 2Q2.1(b)(1)(B) refers to violations committed as part of the offense, again considering both the offense and the relevant conduct, Stimac committed a pattern of violations similar to the instant Lacey Act violation and the acts committed in furtherance of that violation. In violating the Lacey Act by possessing and transporting the bear's head, Stimac repeatedly violated 18 U.S.C. § 1165. On September 1st and 2nd, Stimac violated § 1165 when he entered the Reservation for the purpose of hunting a bear, and he again violated § 1165 when he entered the Reservation on September 3rd to remove the bear's head from the Reservation. We therefore conclude that Stimac's repeated violation of § 1165 demonstrates a "pattern of similar violations" sufficient to warrant application of § 2Q2.1(b)(1)(B).

Accordingly, we conclude that the district court did not commit procedural error in increasing Stimac's base offense level pursuant to § 2Q2.1(b)(1)(B).

III.

For the foregoing reasons, we affirm Stimac's sentence.

_____